UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**VEOLIA WATER MILWAUKEE, LLC,**

Plaintiff,

v. Case No. 2:26-cv-1660

**MILWAUKEE METROPOLITAN SEWERAGE DISTRICT,**

Defendant.

---

# COMPLAINT

---

Plaintiff, Veolia Water Milwaukee, LLC ("Plaintiff"), by its attorneys, von Briesen & Roper, s.c., brings this action against Defendant Milwaukee Metropolitan Sewerage District ("Defendant" or "MMSD") for declaratory and injunctive relief and alleges as follows:

## NATURE OF THE CASE

1. Veolia Water Milwaukee, LLC ("Plaintiff") has served as the Milwaukee Metropolitan Sewerage District's ("Defendant" or "MMSD") operations and maintenance partner since 2008.

2. This Milwaukee partnership is one of the largest public-private wastewater partnerships in North America and includes operation and maintenance of two water reclamation facilities with combined capacity of 630 MGD, a 320-mile collections system, biosolids production, and the 500 MG "Deep Tunnel" storage system.

3. The system treats upwards of 150 million gallons of water on behalf of 29 communities for more than one million people in the Greater Milwaukee area on a daily basis.

4. In 2024, Defendant launched what it represented would be a competitive procurement process for the next ten-year operations and maintenance agreement, Request for Proposals P-3216 ("the RFP").

5. The RFP set out published, weighted evaluation criteria by which Defendant represented it would evaluate competing proposals on their merits.

6. Plaintiff and one other firm, Jacobs Solutions Inc. ("Jacobs"), submitted timely proposals.

7. Plaintiff was entitled to rely on Defendant's representation that the next ten-year operations and maintenance partner would be selected through the genuine, unbiased evaluation process Defendant announced.

8. Upon information and belief, Defendant did not select Plaintiff's replacement through that announced process on its stated terms.

9. Instead, and upon information and belief, the RFP served as the vehicle through which a decision Defendant had already reached, or was predisposed to reach, regardless of the comparative merits of the two proposals, was implemented and given the appearance of a competitive procurement.

10. Not only that, beginning in early 2026, advocacy organizations and elected officials mounted a campaign against Plaintiff outside of, and intended to influence, the procurement process.

11. Upon information and belief, Defendant did not merely decline to resist that campaign, Defendant used it as a vehicle to publicly justify an outcome Defendant already favored.

12. Defendant acted to accommodate the demands of these advocacy organizations and elected officials at nearly every turn, causing the RFP evaluation process to depart,

incrementally and then substantially, from the criteria and procedure Defendant had announced.

13. Despite Defendant's repeated representations to Plaintiff that its evaluation process remained the one announced in the RFP, those process departures, together with unannounced and asymmetrically applied criteria, transformed the evaluation into something fundamentally different from, and considerably less favorable to Plaintiff than, the process Defendant had promised.

14. This transformed process culminated in the August 17, 2026 Recommendation ("the Recommendation") that the next ten-year operations and maintenance agreement be awarded to Jacobs.

15. The Recommendation's own text, upon information and belief and as set forth in detail below, corroborates that the outcome did not depend on a fair comparison of the two proposals on their merits.

16. Wisconsin law provides that once a public body announces the process by which it will award a public contract, it must follow that process consistently and evenhandedly, and that its evaluation and award must reflect its own bona fide, independent judgment rather than the product of a predetermined result or of external pressure directed at that result. *See Aqua-Tech, Inc. v. Como Lake Protection & Rehabilitation Dist.*, 71 Wis. 2d 541 (1976); *Waste Mgmt., Inc. v. Wisconsin Solid Waste Recycling Auth.*, 84 Wis. 2d 462 (1978).

17. Absent a temporary restraining order and preliminary injunction, Plaintiff will suffer irreparable harm for which no remedy at law exists.

18. Under Wisconsin law, a losing bidder is not entitled to money damages for the loss of a public contract; the only remedy available is prospective equitable relief obtained before the challenged contract is awarded and performance begins. *See PRN Assocs. LLC v. DOA*, 2009 WI 53, 317 Wis. 2d 656, 766 N.W.2d 559.

19. No damages award can restore Plaintiff to the position of competing for, and being awarded, a ten-year public services contract on a lawful, uncorrupted record, and no court could meaningfully unwind that outcome once the contract is signed and performance has commenced.

20. Plaintiff therefore brings this action for a declaration that Defendant breached its legal duties to conduct the evaluation under RFP P-3216 consistently and evenhandedly, in accordance with Defendant's announced process, and through the independent, bona fide judgment of the body to which Wisconsin law entrusted that evaluation, rather than through a process pursued to reach, and then to rationalize, a predetermined result.

21. Plaintiff further seeks an injunction restraining Defendant from acting further on the Recommendation reached in breach of those duties, or from entering into any agreement with Jacobs on the strength of that Recommendation, until Defendant has re-conducted the procurement as Wisconsin law requires.

## PARTIES

22. Plaintiff Veolia Water Milwaukee, LLC is a foreign limited liability company organized under the laws of the State of Delaware with offices located at 700 East Jones Street, Milwaukee, Wisconsin.

23. Defendant Milwaukee Metropolitan Sewerage District is a metropolitan sewerage district organized and existing under Wis. Stat. ch. 200, Subch. II, with its principal place of business at 260 West Seeboth Street, Milwaukee, Wisconsin.

24. Defendant is a municipal body corporate that may enter into binding contracts and that may sue and be sued in its own name. Wis. Stat. § 200.29(3).

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Plaintiff and Defendant, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

26. Plaintiff is a limited liability company.

27. For purposes of diversity jurisdiction, a limited liability company is a citizen of every state of which any of its members is a citizen, traced through each successive member up the full ownership chain. *See Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998).

28. The sole member of Veolia Water Milwaukee, LLC is Veolia Water North America – Central, LLC, a Delaware limited liability company.

29. The sole member of Veolia Water North America -- Central, LLC is Veolia Water Municipal Services North America, LLC, a Delaware limited liability company.

30. The sole member of Veolia Water Municipal Services North America, LLC is Veolia Water North America Operating Services, LLC, a Delaware limited liability company.

31. The sole member of Veolia Water North America Operating Services, LLC is WASCO LLC, a Delaware limited liability company.

32. The sole member of WASCO LLC is Veolia North America, Inc., a Delaware corporation with its principal place of business in Wilmington, Delaware.

33. Accordingly, for purposes of 28 U.S.C. § 1332, Plaintiff is a citizen of Delaware, and is not a citizen of Wisconsin.

34. Defendant is, upon information and belief, a citizen of Wisconsin.

35. The amount in controversy exceeds $75,000.00, exclusive of interest and costs, based on the harm to Plaintiff's standing in an active, approximately $650 million public procurement.

36. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in this District.

37. This Court is authorized to grant the declaratory relief sought herein pursuant to 28 U.S.C. §§ 2201–2202, and to grant the temporary and permanent injunctive relief sought herein pursuant to Fed. R. Civ. P. 65, because an actual controversy exists between the parties concerning Defendant's obligations under Wisconsin law in connection with RFP P-3216, and Plaintiff faces imminent, irreparable harm absent such relief.

## FACTUAL ALLEGATIONS

### A. Defendant's Organizational Structure

38. Defendant (MMSD) is governed by a Commission, which consists of eleven members. Wis. Stat. § 200.23(2).

39. Seven commissioners are appointed by the Mayor of the City of Milwaukee, subject to Milwaukee Common Council confirmation. Wis. Stat. § 200.23(2)(a).

40. At least three of the seven commissioners must be elected officials, and each of the seven must reside in the City of Milwaukee. Wis. Stat. § 200.23(2)(a).

41. The remaining four commissioners are appointed by the Executive Council of the Intergovernmental Cooperation Council, which is composed of the mayors and village presidents of Milwaukee County's suburban municipalities. Wis. Stat. § 200.23(2)(b).

42. At least three of these four commissioners must be elected officials, and each must reside within MMSD's service area but outside the City of Milwaukee. Wis. Stat. § 200.23(2)(b).

43. The Commission's current members are Chair Corey Zetts; Vice Chair and City of Glendale Mayor Bryan Kennedy; JoAnna Bautch; Oak Creek Mayor Dan Bukiewicz; Milwaukee Alderman Mark Chambers, Jr.; Milwaukee Alderwoman Milele Coggs; State Representative Kalan Haywood, II; Jose Ramon Ramirez; West Milwaukee Village President John Stalewski; Jeff Stone; and Julia Taylor.

44. Pursuant to Wis. Stat. § 200.25(6), Commissioners receive actual and necessary expenses, as well as a salary, for their service on the Commission.

45. Defendant's day-to-day operations are directed by an Executive Director, Kevin Shafer ("Shafer"), who reports to the Commission and is responsible for administering Defendant's contracts, including the RFP.

46. Commission Secretary Anna Kettlewell ("Kettlewell") maintains the Commission's official records and handles correspondence on the Commission's behalf.

47. For purposes of the RFP, the Commission delegated evaluation and recommendation authority to a five-member Ad-Hoc Operations & Maintenance Contract Selection Committee ("Ad Hoc Committee").

48. The Ad Hoc Committee's members are Chair Dennis M. Grzezinski ("Grzezinski"), Kathy Ehley ("Ehley"), Kris Martinsek ("Martinsek"), John Swan, III ("Swan"), and Michael A. West ("West").

49. Under the RFP, the Ad Hoc Committee is the body responsible for reviewing proposals, conducting interviews with qualified proposers, directing staff to begin discussions and negotiations, and forwarding a final recommendation to the full Commission.

50. The Commission's role under the RFP is final authority to approve or reject the Ad Hoc Committee's recommendation.

**B. RFP P-3216**

51. Since March 2008, Plaintiff has operated and maintained, at Defendant's direction, Defendant's water reclamation facilities (Jones Island and South Shore), the 320-mile collections system, Milorganite biosolids production, and the Deep Tunnel storage system (collectively the "Facilities"), under successor operation and maintenance agreements.

52. The current agreement is scheduled to expire in February 2028.

53. On December 10, 2024, the Ad Hoc Committee held its organizational meeting to begin the process that would culminate in the award of RFP P-3216.

54. At that meeting, Shafer, addressing the evaluation process the Ad Hoc Committee would eventually apply, represented that Defendant's comparison of anticipated Proposals would include a line-by-line comparison of vendors' pricing specifically to identify and screen out any Proposal reflecting unrealistic, below-market pricing: "So if someone undercuts one or overcuts one, we'll compare line items, then to make sure that we feel comfortable with whoever we select."

55. Defendant's staff repeated and elaborated on this representation at Ad Hoc Committee meetings on February 20, 2025 and June 5, 2025, explaining the rationale for structuring a defined category of Task Order services, including sewer cleaning, as per-linear-foot line items rather than a lump-sum payment.

56. Defendant's staff explained to the Ad Hoc Committee that this task-order pricing structure, and the minimum guaranteed work quantities Defendant would build into it, existed so that a proposer's unit rates would reflect the real cost of maintaining adequate staff to perform a guaranteed volume of work: "We will certainly put in minimum quantities that we would guarantee, because obviously they need to have the amount of ... need to know they're going to get enough work to have the staff."

57. Plaintiff was entitled to rely, and did rely, on Defendant's representations that Proposal pricing would be compared line-by-line for reasonableness and staffing realism before being scored, consistent with the purpose Defendant's own staff had articulated for the task-order pricing structure.

58. In September 2025, Defendant issued Request for Proposals P-3216, soliciting proposals from the firms that had pre-qualified through the related Request for Qualifications process.

59. Of the pre-qualified firms, Inframark withdrew before the proposal deadline, leaving Plaintiff and Jacobs as the only two Qualified Proposers competing for a new ten-year operations and maintenance agreement, with an anticipated commencement date of March 1, 2028.

60. The RFP established a defined procurement schedule: an Ad Hoc Committee meeting on December 16, 2025; a Proposal closing date of January 30, 2026; staff and third-party review of submittals from February 1 through February 28, 2026; Ad Hoc Committee interviews with Qualified Proposers from March 15 through April 15, 2026; negotiations with the recommended firm(s) from May 1 through August 1, 2026; an Ad Hoc Committee final recommendation meeting in August 2026; and the Commission's approval in September 2026.

61. The RFP established four weighted Evaluation Criteria for scoring Proposals: Pricing (60%), Company's Overall Approach (25%), Staffing, Training, and Corporate Culture (10%), and Regional Partnership (5%).

62. The RFP also provided that a select group of Defendant's staff and third-party experts would evaluate Proposals and provide feedback anonymously to the Ad Hoc Committee; that the Ad Hoc Committee would conduct interviews with Qualified Proposers and direct staff to begin discussions and negotiations; and that the Ad Hoc Committee would then forward a final recommendation to the Commission for approval.

63. Upon information and belief, the Ad Hoc Committee's recommendation regarding the RFP will go to the Commission Committee on September 14, 2026, and that the full Commission will consider for approval the award of the next operations and maintenance contract on September 28, 2026.

64. Neither the Defendant, the RFP, nor Wis. Stat. ch. 200 establish any administrative bid-protest, appeal, or review procedure applicable to Defendant's evaluation or

award of a contract under the RFP, and upon information and belief Defendant has adopted none.

### C. Common Ground's Public Campaign and the Whistleblower Allegations

65. Common Ground of Southeastern Wisconsin ("Common Ground") is a coalition of member individuals and institutions across Greater Milwaukee.

66. Common Ground alleges that it first became aware of allegations concerning Plaintiff's management of the Facilities in 2023 based on a letter from Steve Jacquart ("Jacquart"), a former employee of Defendant's.

67. Jacquart's MMSD exit interview questionnaire, signed January 29, 2023, states that his principal reason for leaving Defendant was retirement, that his decision was not influenced by "salary, health, working conditions, etc.," and, when asked what he disliked about working for Defendant, that he could not "think of anything significant" and that "we have it pretty good here at MMSD."

68. That document, produced by Defendant, does not mention biosolids processing, treatment capacity, falsified records, or any of the concerns Jacquart and others later raised publicly beginning April 30, 2026.

69. Despite this asserted awareness beginning in 2023, Common Ground took no public action on these allegations for more than two years: not during the RFP's Request for Qualifications process, not during the proposal review period from February through March 2026, and not during the Ad Hoc Committee's interviews with Qualified Proposers from March 15 through April 15, 2026.

70. Common Ground's public campaign began instead on April 30, 2026, after proposals had been submitted, after interviews had been concluded, and as the Ad Hoc Committee moved toward negotiations with a recommended firm.

71. On that date, Common Ground held a public press event identifying Jacquart as a whistleblower and calling on Defendant to conduct an independent, third-party performance audit of Plaintiff before acting on the RFP.

72. The timing of Common Ground's public campaign, activated only as the RFP approached its final, decisive stages and after more than two years of asserted awareness, is inconsistent with a campaign motivated by urgent concern for the allegations themselves and instead reflects a campaign timed to influence the outcome of a specific, pending procurement decision.

### D. Behind The Scenes: Private Channels Opened Long Before Any Public Campaigns Began

73. Unbeknownst to Plaintiff, long before Common Ground's public campaign began on April 30, 2026, Common Ground had already opened private channels to Defendant's own RFP evaluators and Commissioners with the intent to influence the RFP process.

74. By the time Common Ground's campaign became public, Common Ground had already made direct contact with Defendant's Executive Director, the Chair of the Commission, multiple commissioners, and several of the members of the Ad Hoc Committee responsible for scoring Plaintiff's and Jacobs' competing Proposals.

75. None of this contact occurred through, or was disclosed as part of, the RFP process.

76. On January 21, 2026, more than three months before Common Ground's first public press event, e-mail records reflect that Shafer's assistant organized a meeting titled "Common Ground \ MMSD meeting" among Shafer, Common Ground's Bob Connolly ("Connolly"), Jennifer O'Hear ("O'Hear") and Brandon Pinion ("Pinion"), and Kettlewell.

77. The same records reflect that the meeting was scheduled for January 29, 2026 and both Connolly and O'Hear accepted the email invitations.

78. The description of the meeting was "Common Ground request to meet re Veolia performance."

79. Upon information and belief, that meeting took place.

80. On January 30, 2026 Kettlewell emailed Shafer, Connolly, O'Hear and Pinion a copy of the Commission's legislative file analyzing Defendant's ability to bring operations and maintenance services back in house with public sector employees.

81. Connolly responded by requesting that Kettlewell inform him by the end of that day whether "Veolia and Jacobs have submitted bids in response the[sic] RFP."

82. Connolly concluded the email with "We will be in touch."

83. That same day, Shafer's assistant also forwarded to Common Ground a copy of a PowerPoint presentation titled "MMSD August 2025 storm update presentation updated 10.02.25".

84. On February 2, 2026 Kettlewell confirmed to Common Ground that both Veolia and Jacobs had submitted bids.

85. Connolly requested copies of the bids, but Shafer denied the request.

86. On February 6, 2026 Connolly requested the names of the Ad Hoc Committee members, which Kettlewell provided to him on February 11, 2026.

87. On February 14, 2026, Connolly requested that Kettlewell confirm that it would be Grzezinski who would chair the Ad Hoc Committee reviewing the bids, which she did two days later.

88. Connolly also requested contact information for Grzezinski because the "phone number listed for him on an internet search is not correct."

89. Upon information and belief, Connolly and Grzezinski met.

90. On March 10, 2026, Grzezinski acknowledged in a letter to Connolly that Grzezinski had personally met with Common Ground leaders on February 23, 2026 and

thanked them for briefing him on Common Ground's concerns with Plaintiff's management of Defendant’s Facilities.

91. Grzezinski also noted in the letter that he had shared Common Ground's concerns with Shafer.

92. On March 23, 2026, Defendant's Manager of Contract Compliance, Patrick Obenauf, and MMSD Public Information Manager, Bill Graffin, personally met with Connolly.

93. Obenauf followed that meeting with an email to Connolly noting that he "cannot meet "off the record" to discuss the District's Operations and Maintenance Agreement with Veolia."

94. Connolly replied, "[j]ust out of curiosity, on the record, has anyone, MMSD or a third party consultant ever done a Performance Audit (or Review) of Veolia's management of the MMSD waste water treatment facilities?"

95. Obenauf directed Connolly to make the request via a public records request.

96. Graffin then provided Connolly with the personal contact information for each of the Ad Hoc Committee members, explaining that he had omitted Grzezinski from the list "since you already met with him."

97. Corresponding from her personal email account between March 24 and March 26, 2026, Ad Hoc Committee member Martinsek personally arranged an in-person meeting with Common Ground to discuss "an investigation of the management of the MMSD waste water facilities be[sic] Veolia".

98. Between March 24 and March 31, 2026 Commissioner Stone also personally arranged an in-person meeting with Connolly to discuss "an investigation of the management of the waste water system by Veolia".

99. On April 20, 2026, Connolly emailed Ad Hoc Committee member West directly, requesting an in-person meeting and describing Common Ground's activity in terms

that leave no room for characterizing it as passive advocacy: "We are briefing Review Committee members as well as all of the MMSD Commissioners on an investigation we are conducting of the management of the MMSD facilities by Veolia."

100. West declined because he was traveling.

101. Each of these contacts occurred before Common Ground's public campaign began, violated the process disclosed in the RFP and occurred without disclosure to Plaintiff during the pendency of the RFP.

102. The communications described above are not exhaustive of the contacts between Common Ground and MMSD staff, Commission members, and Ad Hoc Committee members.

**E. Each Departure From Defendant's Announced RFP Process Followed a Specific Common Ground Demand**

103. Beginning no later than February 2026, Commission Chair Corey Zetts maintained direct, personal correspondence with Connolly from a non-MMSD email account she uses in her capacity as Executive Director of Menomonee Valley Partners.

104. On March 23, 2026 Connolly asked Zetts to send him a copy of a Commission resolution addressing the option of returning facility operations to public employees.

105. Zetts complied the same day, and in doing so referenced a Wisconsin Policy Forum report that she said had "helped frame some of the discussion around bringing the contract back in house or putting it out to bid".

106. These communications were not disclosed to Plaintiff.

107. On April 13, 2026, Connolly sent Zetts a document titled "The Idea," attaching a draft captioned "Performance Audit of Veolia's Management of the MMSD Wastewater Facilities," and told her: "We have been testing the idea with a number of the Commissioners with whom we are meeting."

108. The draft Connolly sent Zetts called for the MMSD Board to direct staff to solicit an independent performance audit of Plaintiff, specified that "[t]he MMSD Board Chair is to review the RFP before it is published and be part of the selection process," proposed 40 to 50 confidential interviews of current and former employees, and stated that "Common Ground is prepared to . . . work with the chosen consultant to provide the names of people with whom we have spoken confidentially."

109. The audit Defendant ultimately authorized on June 8, 2026 and awarded via RFP on July 13, 2026, tracked this structure, including the scale of the proposed interviews and the role Common Ground proposed for itself in supplying interview subjects.

110. Before Common Ground's public campaign began, Common Ground asked Zetts for time to brief the full Commission on its whistleblower concerns at the Commission's March 2026 monthly meeting.

111. Zetts declined and instructed Common Ground to wait until the June public hearing.

112. Common Ground has stated publicly that it went public on April 30, 2026, rather than wait, because June would be too late relative to the September award decision.

113. On April 22, 2026, Connolly told Zetts that Common Ground's whistleblower "is someone you know very well" and offered to arrange a meeting before the whistleblower spoke publicly, "so that you know what he is going to say on the 30th."

114. Zetts declined that offer, responding that she did not feel comfortable meeting with Common Ground's whistleblower directly.

115. Four days later, on April 30, 2026, Common Ground held its first public press event, at which it identified Jacquart as a whistleblower.

116. On April 17, 2026, Defendant's Director of Legal Services, Katherine Lazarski, personally introduced outside counsel David Froiland of Ogletree Deakins to Connolly, emailing Connolly's contact information directly to Froiland and copying Zetts.

117. Five days later, on April 22, 2026, Connolly told Zetts that Froiland "says he is working for MMSD" and wanted to discuss allegations Common Ground had made, and asked Zetts, "Not sure what this is about - do you?"

118. On April 23, 2026, Zetts replied to Connolly that unfortunately Froiland's firm had a conflict of interest, but that MMSD was currently looking to engage another firm to investigate Common Ground's allegations and hoped that Common Ground would share information with that firm to investigate.

119. On May 5, 2026, O'Hear formally demanded that the Commission authorize an independent audit of Plaintiff.

120. The May 5, 2026 letter was sent to all eleven sitting Commissioners.

121. On May 6, 2026, Common Ground circulated a communication to Commissioners asserting that seventeen individuals had come forward with concerns about Plaintiff's operations, a number far exceeding the two whistleblowers that Common Ground and Defendant had identified by name in any public communication to date.

122. On May 8, 2026, while Defendant's retention of Lake Effect HR & Law to investigate the whistleblower allegations remained pending, Connolly corresponded directly with Lake Effect attorney Emily Gnam regarding a "Proposal for Preliminary Investigative Interviews," copying Defendant's Director of Legal Services, Katherine Lazarski, on the exchange.

123. Common Ground was accordingly given a direct role in shaping the protocol of the very investigation Defendant represented to Plaintiff was to be independent.

124. Attorney Gnam's May 5, 2026 proposal, copied to Lazarski, stated that "Common Ground will identify the witnesses willing to speak to me and invite each of them to be interviewed," and that Gnam had "been instructed by MMSD not to disclose to MMSD leadership or anyone else any personally identifiable information about witnesses identified by Common Ground."

125. The investigation Defendant retained counsel to conduct was accordingly structured so that Plaintiff could not learn the identity of, or respond to, its accusers.

126. That same day, Common Ground rejected the outside counsel Defendant had retained to investigate the allegations, on the ground that counsel was not sufficiently independent of Defendant.

127. Three days later, on May 11, 2026, Defendant announced a whistleblower hotline.

128. On May 13, 2026, Common Ground held a second press event, at which a second former Plaintiff employee, Greg Gryskiewicz, made additional allegations.

**F. Plaintiff Requested That Defendant Pause the Procurement Process In Order To Ensure Fairness**

129. On April 28, 2026, Plaintiff's Chief Executive Officer, Joseph Tackett ("Tackett"), wrote to Shafer requesting that Defendant "immediately pause" the RFP process.

130. By that date, Plaintiff had learned of just a few of the private contacts described above between Common Ground and Defendant's evaluators, and of Common Ground's intention to press for an independent audit of Plaintiff's operations to be considered as part of the RFP process.

131. Tackett's letter characterized Common Ground's private access to Defendant's evaluators as "intentional and targeted interference" with an active public procurement, and requested that Defendant: (a) assess the extent to which Common Ground's materials had

reached members of the Ad Hoc Committee or the Commission; (b) implement recusal procedures for any official who had received or engaged with such communications; and (c) establish a documented record of Defendant's procedural independence, or, alternatively, cancel RFP P-3216 and conduct a fresh re-procurement on a clean record.

132. Without conceding that such notice is required, this letter constituted written notice to Defendant, within the meaning of Wis. Stat. § 893.80(1d)(a), of the circumstances giving rise to this action, describing the time, nature, and basis of Plaintiff's claims.

133. On May 5, 2026, Shafer responded to Tackett in writing, declining each of Plaintiff's requests and representing that Defendant's process was "well publicized" and had been "adhered to."

134. On May 26, 2026, Tackett wrote to Shafer a second time, objecting that Defendant had begun publicly indicating that testimony at an upcoming public hearing "will be considered in the award decision," notwithstanding that no such criterion appeared anywhere in the RFP.

135. On June 8, 2026, Shafer responded that the hearing was being held "due to the advocacy campaign," but that "the evaluation criteria are not altered."

136. Three days later, on June 11, 2026, the Ad Hoc Committee convened that hearing, at which Common Ground and Gryskiewicz delivered their materials directly into the record of the Ad Hoc Committee, the body responsible for scoring Plaintiff's and Jacobs' Proposals.

137. The Ad Hoc Committee's interviews with Qualified Proposers occurred on March 3, 2026 (Plaintiff) and March 5, 2026 (Jacobs).

138. The Ad Hoc Committee conducted technical interviews with Plaintiff on March 26, 2026, April 17, 2026 and April 28, 2026.

139. During Plaintiff's initial interview with the Ad Hoc Committee, all committee members were present.

140. Ad Hoc Committee members Swan and Ehley attended none of Plaintiff's technical interviews.

141. Upon information and belief, West attended two of Plaintiff's three technical interviews.

142. Ad Hoc Committee members Grzezinski and Martinsek attended all three of Plaintiff's technical interviews.

143. Neither the Ad Hoc Committee's Recommendation nor any other document produced to date identifies what information the Committee members who did not attend all three of Plaintiff's technical interviews relied upon in scoring Plaintiff's proposal.

144. Upon information and belief, the Ad Hoc Committee conducted no scoring or evaluation of the competing Proposals for approximately three months following the close of interviews.

145. The Ad Hoc Committee's first closed session captioned "Review of Proposals and Proposal Scoring" occurred on June 12, 2026, the day immediately following the hearing at which Common Ground and Gryskiewicz placed their materials directly into the Ad Hoc Committee's record.

146. The Ad Hoc Committee held two further scoring sessions, on June 22, 2026 and July 6, 2026, before reconvening on August 17, 2026 to adopt the Recommendation described below.

147. Committee member West was excused from, and did not attend, the July 6, 2026 scoring session, one of only three sessions at which the Ad Hoc Committee reviewed and scored the competing Proposals.

148. At every point in this sequence, Defendant represented to Plaintiff that their evaluation process remained the one announced in the RFP. At every point, within days, the record shows otherwise.

149. To date, Defendant has not produced records showing how the Ad Hoc Committee's individual and final recommendation scores were calculated.

### G. Outside Political Influence: Elected Officials Used Real Authority To Reach Into A Decision That Belonged to Someone Else

150. The pressure on Defendant's evaluation of the RFP did not come only from Common Ground, it came also from elected officials who had authority over the reappointment of sitting Commissioners, and who used that authority to influence a decision that belonged, under Defendant's own published process, to the Ad Hoc Committee and the Commission alone.

151. On May 18, 2026, members of the Milwaukee County Board of Supervisors publicly called for a review of Plaintiff's contract by the Wisconsin Legislative Audit Bureau.

152. Two days later, on May 20, 2026, the Milwaukee Common Council's Public Works Committee, Alderpersons Robert Bauman, Alex Brower, Milele Coggs (also a sitting Commissioner), Larresa Taylor, and Lamont Westmoreland (chair), convened to consider the reappointments of Chair Zetts, Alderpersons Chambers, Coggs, and Haywood, and Taylor to Defendant's Commission.

153. Upon information and belief, Connolly was seated in the front row of the Public Works Committee meeting prominently displaying a Common Ground hat.

154. Alderman Bauman opened the Committee's consideration of these reappointments by stating that "there are some issues that I think need to be addressed...by all these candidates for the commission," identifying those issues as ones "raised by Common Ground" and by "whistleblowers."

155. He proposed that the Committee "take all these appointments...as one file and line everybody up and have everyone respond to...the basic question of what, if anything, they as commissioners intend to do about these allegations and how are they going to direct the sewerage commission to proceed."

156. Chair Zetts, appearing to defend her own reappointment, told the Committee that Defendant had "initiated steps to...begin an independent third-party performance audit" that "will be overseen by the commission."

157. Bauman asked what the process for selecting an auditor would be, and then asked: "does this affect the time schedule for deciding the contract between [Plaintiff] and the...competing firm?"

158. Common Council President José Pérez asked whether audit results would come "before you select one of the two vendors," described the audit's purpose as "putting" the whistleblower allegations "to bed whether they're true or not," and stated that his own vote on the reappointments would turn on "how independent this audit is because in the end if [Defendant] is overseeing this audit...it isn't independent."

159. While in front of the Public Works Committee, Zetts also noted the Ad Hoc Committee was "looking at metrics from both...competitors," that the Commission "will ultimately approve and...have a timeline that is scheduled for September," and that Zetts intended "to bring an item to the commission...at the June meeting to...hire a[n] independent third party auditor...with the goal of having that audit be completed before the September decision."

160. Following these exchanges, Alderman Bauman moved to hold every pending reappointment rather than confirm it.

161. Each was held without objection.

162. Alderman Brower asked whether the audit would allow "a full proper review of things before we choose a new operator because this could be disqualifying for the current operator as well."

163. Zetts responded that Defendant was "feeling optimistic about being able to make an informed decision by September."

164. The Committee then recessed.

165. Upon information and belief, during the recess Alderwoman Coggs and Aldermen Bauman, Perez and Chambers participated in a heated discussion regarding the appointments in a side room.

166. When it reconvened approximately thirty minutes later, Bauman moved to reconsider the appointments, and each was confirmed in immediate succession.

167. Before taking the vote, Alderman Brower stated that he would support confirmation "because we need this board to continue to move forward and do its work," but that the Committee needed to "hold [Defendant's] board and [Defendant] and the operator to the highest of standards" and to ensure Defendant's operations were "fully independently verified as being...in line with what we expect from any public operator."

168. Alderwoman Coggs, also up for reappointment, answered, on the record, that she was "committed to making sure that happens and that'll be demonstrated through my votes...on committee."

169. The Common Council's confirmation authority over Defendant's Commissioners extends only to whether an individual sits on the Commission.

170. It confers no role, under the RFP or otherwise, in evaluating or awarding the RFP, a function Wisconsin law and Defendant's own published process commit exclusively to the Ad Hoc Committee and the Commission.

171. The Committee did not inquire into Zetts's general fitness or governance philosophy.

172. It held her reappointment, together with four others, expressly pending assurance about the audit's timing and its bearing on "the contract between [Plaintiff] and the...competing firm," and released the hold only after she committed, on the record, that her future votes on the Commission would demonstrate her commitment to that audit process

## H. The July 2026 Audit and Undisclosed Ties Between the Audit Oversight Committee and Jacobs

173. On July 13, 2026, the Commission voted to retain EMA, Inc., a St. Paul, Minnesota consulting firm, to conduct the independent, third-party audit of Plaintiff's management of the Facilities first announced in May 2026.

174. On August 31, 2026 Common Ground boasted on its Facebook page that it had "successfully pressured" MMSD's Commission into the audit.

175. Defendant's public release described the audit's scope as including Plaintiff's compliance with the terms of its contract with Defendant, Defendant's own oversight of that contract, and recommendations regarding Plaintiff's continued management going forward.

176. On the same date, the Commission named a five-member committee to oversee the audit: Tom Sigmund ("Sigmund"), the retired executive director of NEW Water, the Green Bay Metropolitan Sewerage District; Manny Teodoro, a professor at the University of Wisconsin--Madison's La Follette School of Public Affairs; Wanda Montgomery, Brown Deer Village President; Travis Hope, president of KK River Neighbors in Action; and Jamaal Napoleon of ManpowerGroup.

177. Upon information and belief, results of the EMA audit will be transmitted directly to the Commission, with no published protocol requiring disclosure of those results, or of the oversight committee's deliberations.

178. Sigmund served as executive director of NEW Water from 2007 until his retirement in January of 2025.

179. During that tenure, NEW Water engaged Jacobs on the Resource Recovery and Electrical Energy Generation ("R2E2") project, encompassing preparation of NEW Water's Solids Management Facility Plan, detailed design, construction-phase services, and commissioning.

180. This relationship has been publicized by Jacobs as an example of its water-sector partnership work.

181. On information and belief, Sigmund, in his role at NEW Water, was responsible for or participated in the award of this and other contracts to Jacobs during his tenure.

182. Neither Defendant's July 13, 2026 announcement nor any other public disclosure by Defendant identifies Sigmund's prior professional relationship with Jacobs, or discloses what steps, if any, Defendant took to screen the audit oversight committee's membership for conflicts of interest with either qualified proposer before naming its members.

183. On July 15, 2026, two days after the Commission voted to retain EMA, Commissioner Jeff Stone, the Commission's designated liaison to the audit, personally introduced Connolly by email directly to EMA's lead investigator, Sharon Peters, writing that he wanted "to get the two of you connected right away" and that he did "not want to influence in any way the investigation into MMSD operations."

184. Zetts was copied on the introduction.

185. The audit Defendant describes as independent of this Committee's review was not, on this record, insulated from direct, Commissioner-facilitated access by Common Ground.

**I. August 17, 2026 Meeting and Ad Hoc Committee Recommendation**

186. On August 17, 2026, the Ad Hoc Committee convened, and, on a motion by Committee member West, seconded by Committee member Swan, voted to approve a resolution recommending award of Contract P-3216 to Jacobs, based on a Report and Recommendation dated and signed by the Committee that same day (the "Recommendation").

187. The Recommendation states that Defendant's evaluation methodology allocated 60 of 100 total points to price, 25 points to "Company Approach," 10 points to staffing, training, and corporate culture, and 5 points to regional partnership, and that the Ad Hoc Committee scored Jacobs 96.8 points in the aggregate and Plaintiff 84.9 points in the aggregate, an 11.9-point spread.

188. Of that 11.9-point spread, only 4.8 points derive from the price category, which Defendant calculated using a fixed proportional formula applied to each vendor's revised pricing.

189. The remaining 7.4 points derive from the Company Approach and Staffing, Training, and Corporate Culture categories, each scored, in the Recommendation's own description, as "the average of individual Committee members' scores," without reference to any published sub-criteria or point allocation within those categories.

190. While the Recommendation indicates that the Ad Hoc Committee scored the competing Proposals across four categories (pricing, technology and innovation, staffing and workforce qualifications, and vendor-specific verification opportunities), in reality, the Recommendation credited Jacobs and discounted Plaintiff on grounds Defendant's own conduct and records do not support.

191. For example, the price category is not the fixed, mechanically-derived figure the Recommendation presents.

192. Of the revised Total 10-Year Term Cost the District calculated for each Proposal, $23,406,180 of Jacobs' $54,070,027 total price advantage, approximately 43%, derives from a single task order services line alone.

193. Jacobs priced gravity sewer cleaning of 24- to 48-inch sewers, a task order line item, at $5.54 per linear foot.

194. Plaintiff priced the same line item, based on its actual experience performing this work since 2008, at $54.00 per linear foot, a difference of approximately 90%.

195. Another $4,882,500 of Jacob's total price advantage comes from gravity sewer cleaning of 49-inch and larger sewers, a task order line item, at $37.25 per linear foot.

196. Plaintiff priced the same line item, based on its actual experience performing this work since 2008, at $200.00 per linear foot, a difference of approximately 80%.

197. Neither the Recommendation nor any other document produced to date reflects that Defendant verified Jacobs' task order unit rates, including its sewer-cleaning rate against actual, historical costs of performing this same work, or against any independent engineering estimate, before applying its proportional scoring formula to the resulting totals.

198. Neither the Recommendation nor any other document produced to date reflects that the task order pricing was compared as promised line-by-line to screen out unrealistic, below-market rates, and that the minimum guaranteed work quantities built into that pricing structure existed so that a proposer's unit rates would reflect the real cost of maintaining adequate staff to perform the guaranteed volume of work.

199. Defendant's staff prepared a document titled "P-3216 Operation & Maintenance of Water Reclamation Infrastructure Comparative Proposal Evaluation" (the "Comparative Proposal Evaluation") to assist the Ad Hoc Committee in scoring the proposals.

200. In the Comparative Proposal Evaluation, District staff addressed Jacobs' proposed pricing for corrective maintenance task orders as follows: "Jacobs provided very good

task order pricing for corrective maintenance. It is unclear to staff how Jacobs can offer such good pricing, and staff thinks that there may be future disputes/claims related to task order items."

201. As another example, in the Company Approach category, MMSD staff took a contrary position to the Ad Hoc Committee.

202. On April 30, 2026, the same date Common Ground held its first public press event, Shafer directed Plaintiff in writing to remove from its Base Bid cost proposal a series of specific proposed technologies, including a sewer-system modeling tool, an automated resident-notification platform, biosensor monitoring equipment, sonic leak-detection technology, nanobubble treatment technology, and a calcium nitrate dosing system, stating as to several of these that "MMSD doesn't believe this would be effective" and that Defendant would "discuss piloting" certain of the removed technologies only "if Veolia is awarded the contract."

203. The Ad Hoc Committee, via the Recommendation, then criticized Plaintiff for having "not brought a lot of new ideas.”

204. Upon information and belief, unrealistic, below-market rates appear in the labor portions of Jacobs’ proposal.

205. Jacobs' proposal states that its "represented labor wage rates are adjusted for cost-of-living increases based on current collective bargaining agreement rates."

206. Notwithstanding that representation, Jacobs' proposed wages and benefits for every Corrective Maintenance trade classification priced in its Proposal, including Powerhouse Maintenance Mechanic, Machinist, Electrician, Instrument Technician, and Laborer, are between approximately five and fourteen percent below Plaintiff's proposed rate for the identical position under Plaintiff's existing, binding collective bargaining agreements covering the same classifications.

207. The Ad Hoc Committee also afforded a unilateral opportunity to Jacobs to modify its proposal during the evaluation stage.

208. The Recommendation states that Jacobs' proposal "initially included using some technology from Palantir, but, when a question was raised about Palantir by District staff, Jacobs responded that similar services are available from other vendors and that they would replace Palantir with another contractor if the District wished."

209. District staff put that question to Jacobs in writing on May 7, 2026, more than three months before the Recommendation, asking: "Would it be possible to carve out Palantir efforts from your proposal or is their software integral to your work?"

210. Jacobs responded that it was "platform-agnostic" and could substitute another vendor.

211. The Recommendation treated Jacobs' response as evidence of flexibility.

212. Defendant afforded Plaintiff no comparable opportunity to explain or cure any of the specific concerns the Recommendation ultimately scored against Plaintiff.

213. Considered individually, each of these examples might be explained as a discrete scoring or drafting judgment.

214. Considered together, across pricing, technology, labor, and vendor-specific verification opportunities, they reflect the same pattern stated above: the Ad Hoc Committee credited Jacobs and discounted Plaintiff on grounds Defendant's own conduct and records do not support.

## FIRST CAUSE OF ACTION

### Breach of the Duty to Conduct RFP P-3216 Consistently With Its Announced Process

215. Plaintiff realleges each of the foregoing paragraphs as if fully set forth herein.

216. Wis. Stat. § 200.47(1) authorizes Defendant to "enter into contracts, agreements or stipulations necessary to perform its duties and exercise its powers," including the contract at issue in RFP P-3216.

217. In exercising that discretionary authority, Defendant issued the RFP and announced the process by which the competing Proposals would be evaluated and scored.

218. Having exercised its statutory discretion to announce that process, Defendant owed Plaintiff a duty, recognized under Wisconsin law, to conduct the evaluation of RFP P-3216 consistently with the process it announced. *Waste Mgmt., Inc. v. Wisconsin Solid Waste Recycling Auth.*, 84 Wis.2d 462 (1978) (public body that announces the rules and procedures governing a competitive procurement, in the exercise of discretion conferred upon it, must award the resulting contract in accordance with those announced rules and procedures).

219. This duty is consistent with, and reinforced by, the broader administrative-law principle that an agency of the government must scrupulously observe rules, regulations, or procedures which it has established, and that when it fails to do so, its action cannot stand. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (superseded by statute on other grounds); *Martinez-Camargo v. INS*, 282 F.3d 487, 491 (7th Cir. 2002) (applying the *Accardi* standard in this Circuit); see also *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969) ("An agency of the government must scrupulously observe rules, regulations, or procedures which it has established.").

220. The RFP set forth the exclusive, published evaluation criteria.

221. Defendant nonetheless: (a) opened direct channels of communication between Common Ground and the Ad Hoc Committee and Commission members; (b) attempted to retain, and did retain, outside counsel to investigate Plaintiff's operations during the pendency of the evaluation; (c) authorized and conducted a third-party performance audit of Plaintiff's operations alone, outside the published criteria and timed to run concurrent with the

Commission's decision; (d) convened a public hearing outside the published criteria, presided over by the Ad Hoc Committee's own Chair, at which one-sided testimony and materials concerning Plaintiff alone were received directly into that body's record; and (e) named, to the committee overseeing that audit, a member with an undisclosed prior professional relationship awarding contracts to Jacobs, without any disclosed conflict-screening process.

222. Defendant also afforded Jacobs a documented, individualized, written opportunity to explain and, if necessary, cure a specific concern District staff raised about its Proposal, its use of Palantir, weeks before scoring, while affording Plaintiff no comparable opportunity to explain or cure the specific concerns the Recommendation ultimately scored against it.

223. Defendant likewise accepted, scored, and relied on Jacobs' task order unit rates without the line-by-line comparison Defendant's own staff told the Ad Hoc Committee, before the RFP issued, that Defendant's evaluation would include, without any recorded application of the staffing-realism standard Defendant's own staff articulated as the reason for that pricing structure, and notwithstanding its own staff's documented inability to explain that pricing and staff's own anticipation of future disputes or claims arising from it .

224. A declaration of Defendant's breach will terminate the uncertainty giving rise to this controversy by resolving, before Defendant acts on the Ad Hoc Committee's recommendation, whether that recommendation and any Commission action approving it may stand consistent with Wisconsin law.

225. Plaintiff is entitled to a declaration that Defendant's conduct described above breached its duty to conduct RFP P-3216 consistently with the process it announced, and that the Ad Hoc Committee's recommendation, and any Commission action ratifying it, are void to the extent they rely on information or input outside that announced process; and to temporary and permanent injunctive relief enjoining Defendant from acting upon that recommendation,

awarding the contract to Jacobs, or executing a Service Agreement, unless and until Defendant has re-conducted the procurement free of the breaches described above.

## SECOND CAUSE OF ACTION

### Breach of the Duty to Exercise Independent, Uncorrupted Judgment in Evaluating RFP P-3216

226. Plaintiff realleges each of the foregoing paragraphs as if fully set forth herein.

227. Defendant owed Plaintiff a duty, recognized under Wisconsin law, to ensure that its evaluation and award of RFP P-3216 reflected equal, independent judgment of the body responsible for that evaluation. *Aqua-Tech, Inc. v. Como Lake Protection & Rehabilitation Dist.*, 71 Wis. 2d 541(1976).

228. Defendant nonetheless: (a) was influenced by the Milwaukee Common Council's Public Works Committee holding the reappointment of Chair Zetts and four other Commissioners expressly pending assurance regarding the timing and purpose of a third-party audit of Plaintiff's operations and its bearing on the Commission's decision; (b) permitted one-on-one contact between Common Ground and individual Commissioners and Ad Hoc Committee members described above; (c) established an audit oversight committee without vetting and excluding conflicts of interest; and (d) failed to exercise independent scrutiny of pricing and cost assumptions with material and significant impacts to total pricing as promised during the RFP process.

229. The cumulative effect of this pressure on the body responsible for evaluating and awarding RFP P-3216 breached the duty *Aqua-Tech* imposes.

230. A declaration of Defendant's breach will terminate the uncertainty giving rise to this controversy for the same reasons set forth above.

231. Plaintiff is entitled to a declaration that Defendant's evaluation and award of RFP P-3216 did not, and as of the filing of this Complaint does not, reflect the bona fide,

independent judgment *Aqua-Tech* requires, and that the Ad Hoc Committee's recommendation, and any Commission action ratifying it, are void; and to temporary and permanent injunctive relief enjoining Defendant from acting upon that recommendation, awarding the contract to Jacobs, or executing a Service Agreement, unless and until Defendant's evaluation reflects the independent judgment *Aqua-Tech* requires.

**WHEREFORE,** Plaintiff Veolia Water Milwaukee, LLC requests that the Court enter judgment in its favor as follows:

a. On the First Cause of Action, declaring that Defendant breached its duty to conduct RFP P-3216 consistently with the process it announced, and that the Ad Hoc Committee's recommendation, and any Commission action ratifying it, are void to the extent they rely on information or input outside that announced process;

b. On the Second Cause of Action, declaring that Defendant's evaluation and award of RFP P-3216 does not reflect the bona fide, independent judgment Wisconsin law requires, and that the Ad Hoc Committee's recommendation, and any Commission action ratifying it, are void;

c. Issuing a temporary restraining order, and thereafter a temporary and permanent injunction, enjoining Defendant, its Commission, officers, agents, and employees from approving or acting upon the Ad Hoc Committee's recommendation, awarding the RFP P-3216 contract to Jacobs, or executing a Service Agreement pursuant thereto, until Defendant has re-conducted the procurement as set forth above;

d. Awarding Plaintiff its costs and disbursements in this action; and

e. Providing all such further relief as the Court deems just and equitable.

Dated: September 11, 2026

/s/ Hanna R. Kolberg
Hanna R. Kolberg
Laurie J. McLeRoy
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Telephone: 414-287-1248
Facsimile: 414-238-6567
Email: hanna.kolberg@vonbriesen.com
*Attorneys for Veolia Water Milwaukee, LLC*